# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| EDWARD G. JAWORSKI | : CIVIL ACTION |
|---|---|
| v. | : NO. 17-2708 |
| COMMISSIONER OF SOCIAL SECURITY | : |

## MEMORANDUM

**KEARNEY, J.**  **January 19, 2018**

Edward Jaworski asks we review the Social Security Commissioner's denial of his application for Supplemental Security Income ("SSI") benefits based on his claim of disability arising from Asberger's Syndrome and other social and intellectual limitations. An administrative law judge evaluated and weighed the evidence adduced from several psychiatrists and, in detailed findings, denied Mr. Jaworski's appeal of the Commissioner's ruling. After the Appeals Council also denied his appeal, Mr. Jaworski properly sought our review of the administrative law judge's decision and now raises good faith arguments for reversing the administrative law judge's decision and awarding him benefits. He challenges the weight allocated to his medical evidence as opposed to the Commissioner's evidence. But after careful review of the record and mindful of our limited scope of review, we find substantial evidence for each of the administrative law judge's detailed findings requiring we deny Mr. Jaworski's petition for review in the accompanying Order.

## I. Background

Edward Jaworski is a thirty-one year old man with a high school education.[1] He suffers from Asperger's Syndrome, hypertension, and scoliosis.[2] Mr. Jaworski has never worked full time.[3] Mr. Jaworski worked part time as a dishwasher and a security guard.[4] Mr. Jaworski worked as a dishwasher eight hours a day for four days a week from August 2005 to April 2011.[5] Mr. Jaworski worked five hours a day for three days a week as a security guard from April 2012 to June 2012.[6] Mr. Jaworski also worked as a dishwasher once more for four hours a day twice a week from April 2013 to August 2013.[7] Mr. Jaworski claims his employers fired him from all three positions.[8] Mr. Jaworski claims he made inappropriate comments at work which lead to him being fired from at least one of his dishwashing positions.[9] Mr. Jaworski claims his employer fired him from his security guard position because he did not obtain a driver's license upon his employer's request.[10] Now unemployed, Mr. Jaworski passes the day by completing chores around the house and taking care of his four pets.[11] Mr. Jaworski also runs errands such as picking up his medication at the local pharmacy and sending mail at the post office.[12] Mr. Jaworski also attends services and social activities at his church.[13]

When asked why he could not work or did not look for a new job, Mr. Jaworski offers several reasons, including, "I'm not sure what my skills would be," "I guess my social awkwardness," he felt he is not "mentally sufficient" for a job, he felt "too dumb," he cannot get along with people, and on one occasion Mr. Jaworski simply could not provide a reason.[14]

In October 2013, Mr. Jaworski filed for Social Security Disability Insurance and Supplemental Security Income benefits as of August 25, 2013.[15] The Social Security Administration denied Mr. Jaworski's application.[16] Mr. Jaworski requested a hearing before an administrative law judge.[17] On September 29, 2015, Mr. Jaworski appeared before ALJ Owen

B. Katzman for his hearing.[18] On November 25, 2015, ALJ Katzman denied Mr. Jaworski's claims.[19] Applying the five step analysis outlined below, ALJ Katzman found Mr. Jaworski is not disabled under the Social Security Act as of August 25, 2013 to the date of his decision.[20]

ALJ Katzman found Mr. Jaworski suffered from a "severe" impairment – Asperger's syndrome.[21] But ALJ Katzman found Mr. Jaworski has a residual functioning capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Mr. Jaworski "is limited to simple, repetitive work, with no public contact, and no more than occasional contact with coworkers and supervisors."[22] ALJ Katzman determined Mr. Jaworski is unable to perform his past work.[23] But considering Mr. Jaworski's age, education, experience, and residual functioning capacity, Mr. Jaworski could perform jobs existing in significant numbers in the national economy.[24]

ALJ Katzman assigned little weight to the opinions of treating psychiatrist Ann Marie Wolf-Schatz, M.D. and consultative examiner psychologist Harry Orenstein, Ph.D.[25] Dr. Wolf-Schatz and Dr. Orenstein opined Mr. Jaworski's mental limitations precluded him from working. ALJ Katzman assigned great weight to state agency psychologist Frances Murphy, Ph.D. who opined Mr. Jaworski "is capable of engaging in simple repetitive work activities on a sustained basis in spite of his limitations."[26] The Appeals Council affirmed ALJ Katzman and denied further review.

## II. Analysis

Mr. Jaworski timely filed a request for review in this Court. He argues ALJ Katzman erred in finding (1) the opinion of treating psychiatrist Dr. Wolf-Schatz is entitled to little weight, and (2) the opinion of consultative examiner Dr. Harry Orenstein is entitled to little weight. Mr. Jaworski asserts if ALJ Katzman credited the opinions of Dr. Wolf-Schatz and Dr.

Orenstein, Mr. Jaworski would be found unable to work. At Mr. Jaworski's hearing, ALJ Katzman agreed if he credited Dr. Wolf-Schatz's opinion, Mr. Jaworski could not perform full time work.[27] We deny Mr. Jaworski's objections and affirm ALJ Katzman's findings based on substantial evidence.

Our review of ALJ Katzman's decision is deferential and ALJ Katzman's findings of fact are conclusive if supported by substantial evidence.[28] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[29] Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."[30] To determine whether substantial evidence supports a factual finding, we review the record as a whole.[31] We are bound by the ALJ's factual findings if they are supported by substantial evidence, even if we would have decided the matter differently.[32]

An ALJ must determine whether the claimant is disabled when examining a challenge to the Commissioner's initial decision denying benefits. Under Title II of the Social Security Act ("Act"), a person who has contributed to the program who suffers from a physical or mental disability is afforded insurance benefits.[33] Under Title XVI of the Act, a disabled person may also be entitled to supplemental security income.[34] A disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[35] A claimant is only disabled if their impairments are severe to the point it makes their previous work impossible to do or precludes any other kind of gainful work available in the national economy.[36]

The Commissioner applies a five-step evaluation to determine if a claimant is disabled.[37] If the Commissioner finds disability or non-disability at any step during the analysis, the

4

Commissioner will end the analysis.[38] Under step one, the Commissioner determines whether the claimant is engaged in substantial gainful activity.[39] If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two and is required to determine whether the claimant is suffering from a severe impairment or combination of impairments.[40] Under step three, if the claimant's impairments are severe, the Commissioner compares the impairments to a list of impairments presumed severe enough to preclude gainful employment.[41] If the claimant's impairments or its equivalent matches a listed impairment, the claimant is presumed disabled.[42] If the claimant's impairments do not match impairments on the list, the Commissioner proceeds to step four, where the Commissioner determines the claimant's residual functional capacity ("RFC").[43] A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[44] In step five, if the claimant is unable to return to past work, the Commissioner must prove "there are other jobs existing in significant numbers in the national economy which claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]."[45]

### A. ALJ Katzman did not erroneously weigh Dr. Wolf-Schatz's opinion.

Mr. Jaworski argues ALJ Katzman erred by assigning little weight to Dr. Wolf-Schatz's opinion. Mr. Jaworski argues ALJ Katzman failed to consider Dr. Wolf-Schatz's specialization in the field of mental health and Dr. Wolf-Schatz's extensive treating relationship with Mr. Jaworski. Mr. Jaworski also argues Dr. Wolf-Schatz's opinion is consistent with the adduced evidence.

An ALJ may accord great weight to treating sources' opinions, "especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."[46] A treating source's opinion is entitled controlling weight

5

"when supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record."[47] In rejecting a treating source's opinion, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating source's opinion "due to his or her own credibility judgments, speculation or lay opinion."[48] The ALJ must explain on the record his or her reasons for disregarding a treating source's opinion.[49] It cannot be for "no reason or for the wrong reason."[50]

An ALJ may decide not to credit a treating source's opinion only upon providing an adequate explanation.[51] Our court of appeals instructs us when a treating source's notes, analyzed as a whole, contradict the treating source's opinion on a claimant's ability to work, the ALJ "may properly rely on those notes in determining the opinion is entitled to little or no weight."[52] When assessing medical evidence, the ALJ "should be as comprehensive and analytical as feasible."[53] The ALJ should provide an "expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected."[54] While the ALJ is "required to set forth the reasons for his [or her] decision," these reasons need not be exhaustive.[55] Rather, the ALJ must do more than make broad conclusions without citing factual support in the record, or draw conclusions based solely on vague explanations without citations to the record.[56] An ALJ may reject a treating source's opinion in favor of a non-examining source if the latter is more consistent with the record.[57] The ultimate determination of the claimant's RFC is the province of the ALJ upon an independent analysis of the relevant evidence.[58]

ALJ Katzman provided an adequate explanation for assigning little weight to Dr. Wolf-Schatz's medical opinion questionnaires with citations to the record. Dr. Wolf-Schatz provided two medical opinion questionnaires unaccompanied by substantive analysis.[59] ALJ Katzman

6

assigned little weight to Dr. Wolf-Schatz's opinion finding Dr. Wolf-Schatz's conclusions inconsistent with Mr. Jaworski's treatment notes and her consistent assigning of Mr. Jaworski's global assessment of functioning score ("GAF") at 60.

ALJ Katzman identified an inconsistency between Mr. Jaworski's GAF scores assigned by Dr. Wolf-Schatz and her two medical opinion questionnaires concluding Mr. Jaworski poorly performed in nine and fourteen of twenty-five mental abilities and aptitudes needed to do any job.[60] Dr. Wolf-Schatz completed the opinion questionnaires on April 8, 2014 and September 23, 2015.[61] Between completing these questionnaires, Dr. Wolf-Schatz assessed Mr. Jaworski's GAF score on at least seven occasions.[62] In chronological order, Dr. Wolf-Schatz assigned Mr. Jaworski GAF scores of 40, 60, 60, 60, 60, 60, and 60.[63] ALJ Katzman described a GAF score of 60 out of 100 as functioning at a moderate level of severity and just below the mild range of severity which begins at 61.[64] ALJ Katzman noted GAF scores are "snapshots" of a claimant's functioning at the time of evaluation, but found the GAF scores here are entitled to greater weight because of the consistency in score over time. ALJ Katzman also found Dr. Wolf-Schatz's GAF scores, unlike her medical opinion questionnaires, were consistent with her treatment notes. Most of Dr. Wolf-Schatz's treatment notes identify Mr. Jaworski's behavior as calm, his thought process as logical, his attitude as cooperative, and his judgment as fair.[65] Two months after her last GAF evaluation of 60, Dr. Wolf-Schatz found Mr. Jaworski had poor or no "mental abilities and aptitudes needed to do any job" in fourteen of twenty-five categories listed in the questionnaire.[66] This inconsistency lead to ALJ Katzman's conclusion Dr. Wolf-Schatz's opinion is entitled to little weight.

Mr. Jaworski argues Dr. Wolf-Schatz's opinion is consistent with the record evidence because several doctors included notes Mr. Jaworski became uncontrollably agitated at work.

7

Mr. Jaworski claims his employer fired him on at least one occasion because he cursed at a co-worker.[67] ALJ Katzman reviewed the medical evidence from Mr. Jaworski's treating and examining sources and found the notes did not include reports Mr. Jaworski made inappropriate comments or acted in an agitated state. Rather, the notes only reflected Mr. Jaworski's own report he made inappropriate comments while at work and at times became agitated.[68] As stated above and below, Mr. Jaworski's medical evidence commonly identified his behavior as calm and cooperative. Upon inspection of the record, ALJ Katzman found the record did not support a finding Mr. Jaworski on occasion became unpredictably angry and agitated.

Mr. Jaworski also argues ALJ Katzman failed to consider Dr. Wolf-Schatz's specialty in mental health and the fact she treated Mr. Jaworski for an extended period. Contrary to Mr. Jaworski's argument, ALJ Katzman identified Dr. Wolf-Schatz as Mr. Jaworski's treating psychiatrist.[69] ALJ Katzman also noted Dr. Wolf-Schatz treated Mr. Jaworski for two years.[70] Although treating sources are generally afforded greater weight, ALJ Katzman found an inconsistency between Dr. Wolf-Schatz's conclusions, her treatment notes, and the record as a whole. Based on this inconsistency, ALJ Katzman could and did find Dr. Wolf-Schatz's opinion is entitled to little weight. ALJ Katzman provided an adequate reason for assigning little weight to Dr. Wolf-Schatz's opinions.

### B. ALJ Katzman did not erroneously weigh Dr. Orenstein's opinion.

Mr. Jaworski argues ALJ Katzman erred by assigning little weight to consultative examiner Dr. Orenstein's opinion. ALJ Katzman assigned little weight to Dr. Orenstein because his opinion of marked and extreme mental work-related limitations is inconsistent with the generally normal mental status examinations found in the record.

8

ALJ Katzman provided an adequate reason to assign little weight to Dr. Orenstein's opinion. Dr. Orenstein evaluated Mr. Jaworski in December 2013.[71] Dr. Orenstein concluded Mr. Jaworski's impairments created a marked restriction in Mr. Jaworski's ability to interact appropriately with the public and co-workers.[72] Dr. Orenstein also concluded Mr. Jaworski's impairments created an extreme restriction in his ability to respond appropriately to usual work situations and changes in routine work settings, to carry out complex instructions, and to make judgments on complex work-related decisions.[73] Dr. Orenstein noted in his substantive analysis, "While [Mr. Jaworski] was not bizarre, some of his answers approached delusional."[74] In the same paragraph, Dr. Orenstein noted Mr. Jaworski denied experiencing auditory and visual hallucinations.[75] Dr. Orenstein found Mr. Jaworski "presented as having Asperger syndrome in conjunction with delusional activity and preoccupation with hell and shame."[76] Dr. Orenstein also found Mr. Jaworski "would have serious difficulty with competitive employment due to his unpredictable agitation, lack of confidence and poor academic skills."[77]

ALJ Katzman compared Dr. Orenstein's opinion to the treatment notes of Dr. Wolf-Schatz, Brian Long, M.D., Nora Margolis, M.D., and Norma Cruz Luna, M.D. Dr. Long, Dr. Margolis, and Dr. Cruz Luna provided medication management services for Mr. Jaworski. As part of the medication management services, each doctor evaluated Mr. Jaworski's mental status.[78] The medication management evaluation forms are dated as recently as July 23, 2015 and date back to August 16, 2012.[79] In all of Mr. Jaworski's medication management notes, all evaluators marked hallucinations, delusions, and obsessions as "not present."[80] In September 2012, Mr. Jaworski claimed he could hear the voice of Satan.[81] But shortly after clarified he did not actually hear Satan's voice, he only felt a spiritual conflict regarding his religious beliefs.[82] In Mr. Jaworski's mental status evaluations, the evaluators consistently found Mr. Jaworski to

behave in a calm and cooperative manner.[83] As of July 2012, Mr. Jaworski reported to his therapist his family pushed him to increase his independence and Mr. Jaworski himself wanted to experience more independence.[84] In 2013, Dr. Wolf-Schatz repeatedly described Mr. Jaworski's impairment as "high functioning autism."[85] Upon review of the numerous mental evaluations of Mr. Jaworski, ALJ Katzman found Dr. Orenstein's conclusions inconsistent with the record.[86]

Mr. Jaworski argues ALJ Katzman failed to consider appropriate factors in weighing Dr. Orenstein's opinion including the fact Dr. Orenstein specialized in mental health and failed to consider the consistency of Dr. Orenstein's opinion with Dr. Wolf-Schatz's opinion. ALJ Katzman acknowledged Dr. Orenstein held a Ph.D. and performed a consultative examination.[87] As examined above, ALJ Katzman also evaluated the consistency of Dr. Orenstein's opinion against the "record as a whole."[88] ALJ Katzman compared Dr. Orenstein's opinion to the opinions of the mental status evaluators listed above, including Dr. Wolf-Schatz.

Based on ALJ Katzman's inspection of Dr. Orenstein's opinion and Mr. Jaworski's medical evidence, ALJ Katzman concluded Dr. Orenstein's opinion is entitled to little weight. ALJ Katzman's explanation discounting Dr. Orenstein's opinion is brief but is supported by citation to the record. ALJ Katzman provided an adequate reason to assign little weight to Dr. Orenstein's opinion.

### C. Conclusion

In an accompanying order, we deny Mr. Jaworski's Petition for Review and dismiss her complaint. ALJ Katzman faced the difficult task of reviewing extensive medical evidence spanning several years and determining whether a person suffering from mental illness is capable of working. ALJ Katzman acknowledged Mr. Jaworski's limitations from Asperger's syndrome but found Mr. Jaworski capable of completing simple and repetitive work with little contact with

co-workers and the public. Our review today is not based on whether we would arrive at the same conclusion as ALJ Katzman. We only determine whether ALJ Katzman's findings are based on substantial evidence from the record after considering the weight assigned to the adduced evidence. ALJ Katzman provided adequate reasons supporting his assignment of weight to the opinions of Dr. Wolf-Schatz and Dr. Orenstein and supported his analysis with citation to the record. We deny Mr. Jaworski's objections and affirm ALJ Katzman's findings supported by substantial evidence.

---

[1] ECF Doc. No. 8, Social Security Administrative Record ("R.") at R. 33-34.

[2] R. 38, 407.

[3] R. 34.

[4] R. 178.

[5] R. 178-79.

[6] R. 181.

[7] R. 180.

[8] R. 34.

[9] R. 42.

[10] R. 49-50.

[11] R. 35.

[12] R. 35.

[13] R. 36.

[14] R. 34, 39, 430, 512, 557.

[15] R.

11

[16] R. 82-89.

[17] R. 90.

[18] R. 30-55.

[19] R. 16-25.

[20] R. 25.

[21] R. 18. ALJ Katzman found Mr. Jaworski's hypertension and scoliosis are not severe. R. 18-19. ALJ Katzman found Mr. Jaworski's hypertension is well-controlled with medication and Mr. Jaworski did not present evidence of complications stemming from the hypertension. R. 18. ALJ Katzman also found Mr. Jaworski never sought treatment for his scoliosis and the scoliosis does not limit Mr. Jaworski's ability to perform basic work-related activities. R. 19. Mr. Jaworski's does not challenge ALJ Katzman's findings relating to his hypertension and scoliosis.

[22] R. 20.

[23] R. 24.

[24] R. 24.

[25] R. 23.

[26] R. 64 and 75.

[27] R. 52.

[28] *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)).

[29] *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)).

[30] *Id.* (quoting *Rutherford*, 399 F.3d at 552) (internal quotations omitted).

[31] *Id.* (citing *Schaudeck v. Comm'r*, 181 F.3d 429, 431 (3d Cir.1999)).

[32] *Trinh v. Astrue*, 900 F. Supp. 2d 515, 518 (E.D. Pa. 2012) (citing *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001)).

[33] 42 U.S.C. § 423(a)(1)(D).

[34] 42 U.S.C. § 1381 *et seq.*

[35] 42 U.S.C. § 423(d)(1)(A); § 1382c(a)(3)(A).

[36] *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

[37] *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004).

[38] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[39] *Id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability if claimant is engaged in substantial gainful activity).

[40] *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating finding of non-disability if claimant's impairments are not severe).

[41] *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[42] *Id.*

[43] *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[44] *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001).

[45] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). *Plummer*, 186 F.3d at 428.

[46] *Matuskowitz v. Barnhart*, 348 F. Supp. 2d 371, 374 (E.D. Pa. 2004) (citing *Plummer* 186 F.3d at 427).

[47] *Miller v. Berryhill*, No. 16-00521, 2017 WL 3648494, at *3 (E.D. Pa. Aug. 22, 2017) (citing 20 C.F.R. § 416.927(c)(2)).

[48] *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (internal quotation marks omitted).

[49] *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986).

[50] *Morales*, 225 F.3d at 317 (internal quotations marks omitted).

[51] *Sherrod v. Barnhart*, No. 01-4731, 2002 WL 31429337, at *3 (E.D. Pa. Oct. 29, 2002).

[52] *Smith v. Astrue*, 961 F. Supp. 2d 620, 643 (D. Del. 2013) (citing *Dula v. Barnhart*, 129 F. App'x 715, 719 (3d Cir. 2005)); *Humphreys v. Barnhart*, 127 F. App'x 73, 76 (3d Cir. 2005).

[53] *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974).

[54] *Cotter*, 642 F.2d at 705.

[55] *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x. 116, 120 (3d Cir. 2016) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000) (alteration in original)).

[56] *See Gross*, 653 F. App'x., at 120-21.

[57] *Salerno v. Comm'r of Soc. Sec.*, 152 F. App'x 208, 209 (3d Cir. 2005); *Hudson v. Comm'r of Soc. Sec.*, 93 F. App'x 428, 431 (3d Cir. 2004).

[58] *Chandler v. Comm'r Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

[59] Form reports unaccompanied by through written reports are generally considered "weak evidence." *See Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

[60] R. 525-27, 572-74.

[61] R. 525-27, 572-74.

[62] R. 512-515, 540-41, 542-43, 546-47, 557-562.

[63] R. 512-515, 540-41, 542-43, 546-47, 557-562.

[64] R. 23.

[65] R. 512-515, 540-41, 542-43, 546-47, 557-562.

[66] R. 572-74.

[67] R. 40.

[68] R. 338-39, 429-30, 527.

[69] R. 23.

[70] R. 22.

[71] R. 425-27. In an effort to elevate the opinions of Dr. Wolf-Schatz and Dr. Orenstein and discount Dr. Murphy's opinion, Mr. Jaworski notes Dr. Murphy reviewed Mr. Jaworski's medical record on February 4, 2014. Mr. Jaworski asserts Dr. Murphy's analysis is unreliable because he reviewed the record before Dr. Wolf-Schatz created her two questionnaire opinions and before numerous mental health records were created by Mr. Jaworski's evaluators at Central Montgomery. Unfortunately for Mr. Jaworski, Dr. Orenstein drafted his opinion *before* Dr. Murphy in January 2014. If we were to apply Mr. Jaworski's logic, Dr. Orenstein's opinion

14

would be more unreliable than Dr. Murphy's due to its chronology and scope of records available at the time Dr. Orenstein drafted his opinion.

[72] R. 426.

[73] R. 425-26.

[74] R. 431.

[75] R. 431.

[76] R. 432.

[77] R. 432.

[78] R. 351, 354, 357, 360, 364, 375, 379, 382, 387, 394.

[79] R. 375.

[80] R. 351, 354, 357, 360, 364, 375, 379, 382, 387, 394.

[81] R. 387.

[82] R. 385. A focus of Mr. Jaworski's therapy sessions centered on his religious beliefs and his conflict in finding a religion matching his ideals and lifestyle. Mr. Jaworski's therapist noted at times Mr. Jaworski experienced a preoccupation with religion and at times expressed extreme religious views and interpretations. R. 385.

[83] R. 339, 344, 347-48, 351-52, 356-61, 363-365, 369-70, 374-76, 378-80, 382-86, 388, 390-91, 394-96, 398, 408, 417.

[84] R. 397-98.

[85] R. 338, 342, 345.

[86] R. 23.

[87] R. 21, 23.

[88] 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).